IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| ROBERT BOSCH, LLC, A DELAWARE LIMITED LIABILITY COMPANY,<br><br>    Plaintiff,<br><br>vs.<br><br>GERRESHEIMER WILDEN PLASTICS (USA), LP, A GEORGIA LIMITED PARTNERSHIP,<br><br>    Defendant. | Case No.: _____<br><br><br><br>**COMPLAINT** |

Plaintiff Robert Bosch LLC, through its undersigned attorneys, states the following as its Complaint against Defendant Gerresheimer Wilden Plastics (USA), LP:

**PARTIES AND JURISDICTION**

1. Robert Bosch LLC ("Bosch") is a Delaware limited liability company with a principal place of business for its automotive operations in Farmington Hills, Michigan. Bosch has two members: Robert Bosch North America Corporation, a Delaware corporation, with its principal place of business in Delaware; and Robert Bosch Zweite VermoegensverwaltungsgesellschaftmbH, a German corporation with its principal place of business in Gerilingen-Schillerhoehe, Germany.

2. Bosch is a Tier 1 automotive supplier to all of the major vehicle manufactures, including General Motors ("GM") and the Ford Motor Company ("Ford") (GM and Ford are each also known as an original equipment manufacturer ("OEM")).

3. Defendant Gerresheimer Wilden Plastics (USA), LP ("Wilden") is a Georgia limited partnership with its principal place of business in Peachtree City, Georgia. Wilden's general partner is Gerresheimer Peachtree, City, Inc., a Georgia corporation, with its principal place of business in Peachtree City, Georgia.

4. Wilden was a Tier 2 supplier of automotive components to Bosch and other Tier 1 companies. Wilden conducts regular and systematic business in many states, including Georgia and South Carolina.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy greatly exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Wilden conducts business in this District, and a substantial part of the events or omissions giving rise to these claims occurred in this District.

**FACTUAL BACKGROUND**

7. Wilden manufactured and supplied Bosch with molded plastic Hydraulic Blocks (the "H-Blocks") for a Transmission Control Module ("TCM") that Bosch sold to GM and Ford. Wilden supplied the H-Blocks to Bosch at Bosch's Anderson, South Carolina manufacturing plant.

8. Wilden manufactured and supplied the H-Blocks to Bosch beginning in 2006 under various Purchase Orders.

9. When Wilden began to supply the H-Blocks to Bosch, it was not yet a part of Gerresheimer. In or around 2008, Wilden was purchased by The Blackstone Group and was combined with Gerresheimer, another company owned by Blackstone.

*The Automotive Supply Chain*

10. The automotive supply chain has evolved over time into a tiered system. At the top of the chain are the vehicle manufacturers who assemble the complete vehicle. Tier One suppliers like Bosch are responsible for a complete system or module that can be easily incorporated into the vehicle. In this case, Bosch supplies a completed TCM. Companies like Wilden, which supply discrete component parts for the TCM are Tier Two suppliers.

11. Due to the vehicle manufacturers' mandate to squeeze as many costs as possible out of the supply chain, virtually every automotive contract is sole sourced – only one supplier is selected to supply a component or assembly. This reduces the cost of duplicate tooling and logistics, and also increases the likelihood of savings through economies of scale and an accelerated learning curve.

12. Additionally, for both safety and traceability reasons, all automotive component parts and assemblies must pass the rigorous production part approval process ("PPAP") before the part or assembly may be used in a vehicle. Any change in a supplier for a component requires new certification under PPAP; it may take a new supplier a year or longer to qualify safety-critical parts under PPAP.

13. Finally, inventories are kept to a minimum using a "Just-In-Time" system. Vehicle manufacturers maintain only a few days' supply of assemblies and rely upon their Tier One suppliers to ship new parts as they are needed in production. In turn, Bosch orders in the same manner from its supply base, the Tier Two suppliers.

14. Accordingly, even minor disruptions in the supply chain can have major consequences. The failure of any assembly to arrive at the vehicle manufacturer's plant on-time

can stop vehicle production and cost the supplier who failed to provide the assemblies as much as $100,000 per hour.

*Expiration of the Supply Agreement on December 31, 2008*

15. As a result of the downturn in the automotive industry in the late 2000s (and the economy as a whole), equity funds began to purchase ailing automotive suppliers at a huge discount in hopes of reaping profits. Upon information and belief, Blackstone's purchase of Wilden was one of many such transactions in the last few years.

16. The influx of equity players has dramatically altered the automotive landscape. Rather than "weathering the storm" as an integrated supply base, equity investors seek immediate profit; many have attempted to exit the automotive business quickly, leaving upper tier suppliers without a stable supply.

17. Despite the fact that both Bosch and its suppliers quote products based on a supply relationship for the expected length of a vehicle manufacturer's program, Bosch has traditionally contracted on a three year basis, expecting to extend the contracts before expiration. The contracts between Wilden and Bosch for the manufacture and sale of the H-Blocks expired on December 31, 2008.

18. When Bosch began discussions with Wilden about a new contract for the next three years of the program, it was clear that, under Blackstone's direction, Wilden had decided to "exit" the automotive business and focus on its medical supply business. The timing of Wilden's announcement of its intentions prevented Bosch from resourcing the H-Blocks before the expiration of Bosch's existing contract with Wilden.

19. Wilden gave Bosch two alternatives. One option was to move production to Mexico with the understanding that Wilden would then sell its plant in Mexico to a third party.

4

This introduced new ownership of a critical supplier and thus would have required the parties to re-PPAP the H-Blocks supplied by Wilden. Consequently, this option introduced a high degree of uncertainty as to whether the new supplier would pass PPAP, the timing of such approval and, ultimately, the ability of Bosch to rely on a continuing supply of H-Blocks.

20. The second option was for the manufacture and sale of the H-Blocks for all of 2009 at a significant price increase of both 5% **and** 8.5% for 2009 with the understanding that Bosch would resource the H-Blocks by the end of 2009. (The 8.5% was a low-volume surcharge based on the number of H-Blocks ordered.) It should be noted that, excluding adjustments for raw materials, the piece price for automotive components is usually reduced during each year of a contract per the requirements of the OEM customers.

21. During the negotiations, the parties took opposing hard-line positions. Bosch was adamant that it would not accept any price increases. Wilden insisted that Bosch not only pay a price increase, but also pay for Wilden's capital equipment used in the manufacture of the H-Blocks. In this industry upper tier suppliers are never obligated to pay directly for a lower tiered supplier's capital equipment.

22. Ultimately, the parties had a lengthy teleconference on February 13, 2009, in which an agreement was reached. Wilden prepared and forwarded to Bosch a Memorandum setting forth the terms of the pricing agreement for manufacture and sale of the H-Blocks by Wilden to Bosch for the entirety of 2009. The precise terms set forth by Wilden in that Memorandum are as follows:

- Bosch agrees to the price increases of 5% and 8.5%. The increases start with deliveries from January 20, 2009. If 800,000 sets are ordered by Bosch in 2009, the low volume surcharge of 8.5% will be reimbursed to Bosch.

5

- Gerresheimer Wilden Plastics will grant access to the production equipment to a future supplier of Bosch. Bosch has to communicate who will be viewing the equipment.

- Depending upon the prices quoted for the production equipment, Gerresheimer Wilden Plastics will support and give insight on the production process know-how. Visits of parties interested in the equipment would be arranged by Bosch till the end of week 9

- The transfer of the H-Block production to a new supplier to Bosch Anderson will be finalized by the end of December 2009.

(Gerresheimer Wilden Plastics' Memorandum, attached hereto as Exhibit A.)

23. Bosch acknowledged receipt of the Memorandum from Wilden, stating "We received the Memorandum of the teleconference of February 13, 2009 which set out the agreement of Bosch and Wilden for the pricing of the H-Blocks to be manufactured by Wilden for Bosch in 2009." Bosch sought clarification, but not change, of the bullet points in the Meeting Minutes. In particular, Bosch wanted confirmation of the part numbers which were affected by the 5% and 8.5% increases and whether all of the increases would be reimbursed if Bosch ordered 800,000 sets from Wilden during 2009. (E-mail from John Hutcheson (Purchasing Director at Bosch Anderson) to Wilden's Christian Lapka dated February 23, 2009, attached hereto as Exhibit B at 2-3.)

24. Mr. Lapka, the author of Wilden's February 13 Memorandum (Exhibit A), confirmed that the part number clarification was correct. However, Mr. Lapka stated that "[t]he 5% will not be reimbursed depending upon the quantity. They pertain to an overall cost increase, as stated in the price details of the first letter." (E-Mail from Christian Lapka to John Hutcheson dated February 23, 2009, attached hereto as part of Exhibit B at 2.)

6

25. On March 6, 2009, Mr. Hutcheson confirmed the agreement stating: "Thank you for confirmation of our agreement. Bosch accepts the clarification of the one point in Item 2 of my February 23, 2009 email regarding Gerresheimer Wilden's non-reimbursement of the 5% price increase on all parts." (E-mail from John Hutcheson to Christian Lapka dated March 6, 2009, attached hereto as part of Exhibit B at 1; Exhibits A and B will be referred to as the "Price Agreement for 2009.")

26. The parties implemented the price increase by way of amendments to the Scheduling Agreements, effective from the January 20, 2009 shipment.

*The Breach by Wilden*

27. Once Bosch committed to having Wilden supply the H-Blocks under the Price Agreement for 2009, and focused the timing of its resourcing of the H-Blocks to December 31, 2009, Wilden decided that, despite its contractual agreement with Bosch, it had not economically extracted the maximum dollar amount it could have from Bosch for continued production. Wilden then renewed its demand for payment for its capital equipment, a demand that had been rejected by Bosch and was not included in the Price Agreement for 2009.

28. Indeed, the parties addressed the issue of capital equipment in the Price Agreement for 2009 in an entirely different framework. Bosch agreed to have its new suppliers look at the equipment and, if the supplier decided to purchase the equipment for a sufficient price, Wilden would "support and give insight on the production process know-how." (Exhibit A.)

29. On April 24, 2009, Wilden issued an invoice to Bosch for an initial payment of $355,257 for capital equipment (the "Equipment Invoice") used to manufacture the H-Blocks. Bosch rejected the Equipment Invoice as having no basis in fact , and clearly not part of the Price

Agreement for 2009.  (Equipment Invoice, attached as Exhibit C.)  Bosch accurately summarized the Price Agreement for 2009, stating that it contained no agreement by Bosch to pay for the capital equipment.  (Bosch letter to Wilden dated May 15, 2009, attached as Exhibit D.)

30. Wilden nevertheless refused to abide by the Price Agreement for 2009.  Instead, by email dated May 18, 2009, Wilden demanded that the Equipment Invoice be paid in full and stated that all future shipments of H-Blocks from Wilden to Bosch would include an additional $1.26 per set price increase, which Bosch had to pay.  Wilden made it clear that if Bosch refused to pay the $355,257 Equipment Invoice, **and** if Bosch refused to agree to pay an additional $1.26 per part for each new H Block delivered until the number of sets shipped in 2009 reached a total of 600,000 units, Wilden would immediately stop shipment of H-Blocks to Bosch.

31. Bosch had no choice but to pay Wilden's non-contractual demand since it had stopped all efforts to immediately resource the H-Blocks as a result of the Price Agreement for 2009.  If Bosch did not pay the Equipment Invoice, and Wilden refused to ship H-Blocks, production lines in Bosch's Anderson, South Carolina plant, and, ultimately certain GM and Ford plants receiving the product from Bosch into which the H-Blocks were integrated, would have been shut down.  The economic consequences to Bosch (and Wilden) would have been severe, including OEM customer plant shutdown costs, the loss of current and future OEM business, and the loss of Bosch's reputation.  Bosch agreed to pay the Equipment Invoice and the increase part price going forward "in order to avoid these shutdowns and mitigate the substantial and irreparable damages that would result from the shutdowns which would otherwise occur" and did so "under protest and with full reservation of all of its legal rights."  (Bosch letter to Wilden dated May 20, 2009, attached as Exhibit E.)

8

32.   Over the course of 2009, Bosch was wrongfully forced to pay Wilden approximately $756,000 in excess of the amounts owing under the 2009 Price Agreement in order to receive the contracted H-Blocks from Wilden. Bosch at all times did so to mitigate its damages and avoid the catastrophic consequences that a supply interruption would have caused, and did so under protest and with full reservation of rights.

## FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

33.   Bosch incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

34.   Between February 13, 2009 and March 6, 2009, Bosch and Wilden documented their agreement to pricing for H-Blocks for all of 2009. The Price Agreement for 2009 is evidenced by the attached Exhibits A and B.

35.   Wilden breached the Price Agreement for 2009 by demanding and receiving from Bosch, under threat of Wilden stopping the shipments of H-Blocks to Bosch, approximately $756,000 in excess of the amounts due to Wilden under the Price Agreement of 2009.

36.   As a consequence of Wilden's breach, Bosch has been damaged in the amount of $756,000, plus consequential and incidental damages.

## FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

37.   Bosch incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

38.   Wilden received a benefit from Bosch in the form of monies that Wilden wrongfully demanded and obtained from Bosch in excess of those prices and payments agreed

upon by the parties for the sale and purchase of H-Blocks from Wilden to Bosch in the Price Agreement for 2009.

39.     Inequity will result if Wilden is allowed to retain the benefit of Bosch's monies without returning same.

40.     Wilden has been unjustly enriched in an in excess of $756,000, together with interest and costs.

41.     As a result of Wilden being unjustly enriched, Bosch has further suffered damages in the form of attorney fees and court costs as of the filing of this Complaint.

## FOR A THIRD CAUSE OF ACTION
### (Promissory Estoppel)

42.     Bosch incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

43.     Through its words and conduct, Wilden impliedly or expressly promised to supply Bosch with the H-Blocks throughout 2009 at those prices agreed upon by the parties in the Price Agreement for 2009.

44.     It was Wilden's intent that Bosch rely on its implied or express promise to supply Bosch with the H-Blocks throughout 2009 at those prices agreed upon by the parties in the Price Agreement for 2009.

45.     Bosch reasonably relied upon Wilden's promise to supply Bosch with the H-Blocks throughout 2009 at those prices agreed upon by the parties in the Price Agreement for 2009.

46.     When Wilden made the promise to Bosch and induced Bosch to act in reliance on that promise, Wilden either did foresee or should have reasonably foreseen that Bosch would rely on Wilden's promise.

47. Bosch has been damaged as a direct and proximate result of Wilden's breach of its promise and as a result of Bosch's justifiable and detrimental reliance on that promise.

48. To avoid injustice, this Court should enforce Wilden's promise to Bosch and award to Bosch the extensive damages incurred by Bosch as a result of the actions of Wilden.

## FOR A FOURTH CAUSE OF ACTION
### (Accounting/Constructive Trust)

49. Bosch incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

50. Bosch is entitled to an accounting of all monies wrongfully demanded and obtained from Bosch by Wilden and to the imposition of a constructive trust on all funds retained by Wilden as a result of its wrongful acts.

## RELIEF REQUESTED

WHEREFORE, Bosch respectfully requests that this Court:

A. Enter an award of damages in favor of Bosch and against Wilden for all damages incurred by Bosch as the result of Wilden's breach of the contract between the parties, Wilden's unjust enrichment, and/or Wilden's breach of its pricing promise, including an award of incidental and consequential damages, interest and attorney fees;

B. Enter an order imposing a constructive trust on all funds wrongfully obtained by Wilden from Bosch and for the immediate return of such funds to Bosch; and

C. Grant such other relief as this Court deems just and equitable.

/s/Cherie W. Blackburn

Cherie W. Blackburn       Fed ID No. 1575
NEXSEN PRUET, LLC
205 King Street, Suite 400 (29401)
P.O. Box 486
Charleston, SC  29402
PHONE:  843.577.9440
FACSIMILE:  843.720.1777
cblackburn@nexsenpruet.com

William R. Jansen (P36688)
Pamela M. Miller (P70136)
WARNER NORCROSS & JUDD, LLP
2000 Town Center, Suite 2700
Southfield, Michigan 48075
PHONE:  248.784.5000
FACSIMILE:  248.603.9753
pmiller@wnj.com

Attorneys for Plaintiff Robert Bosch, LLC

September 29, 2010
Charleston, South Carolina